**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NORTH CAROLINA RIGHT TO LIFE,
INCORPORATED; NORTH CAROLINA
RIGHT TO LIFE POLITICAL ACTION
COMMITTEE; BARBARA HOLT,
President of North Carolina Right to
Life, Incorporated,
<u>Plaintiffs-Appellees,</u>

v.

GARY O. BARTLETT, in his official
capacity as Executive Secretary-
Director of the State Board of
Elections of the State of North
Carolina; STEVE A. BALOG, in his
official capacity as District Attorney
for North Carolina Prosecutorial

District 15A, and as a representative
of the class of District Attorneys in
the State of North Carolina; MIKE
EASLEY, in his official capacity as
Attorney General for the State of
North Carolina; JUNE K.
YOUNGBLOOD, in her official capacity
as a Member of the State Board of
Elections; DOROTHY PRESSER, in her
official capacity as a Member of the
State Board of Elections; LARRY
LEAKE, in his official capacity as
Chairman of the State Board of
Elections; S. KATHERINE BURNETTE,
in her official capacity as Secretary
of the State Board of Elections;

No. 98-1636

FAIGER M. BLACKWELL, in his
official capacity as a Member of the
State Board of Elections,
Defendants-Appellants.

NORTH CAROLINA ALLIANCE FOR
DEMOCRACY; AMERICAN CIVIL
LIBERTIES UNION OF NORTH CAROLINA
LEGAL FOUNDATION, INCORPORATED,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-96-835-5-BO-1)

Argued: October 27, 1998

Decided: February 17, 1999

Before WILKINSON, Chief Judge, and ERVIN and
WILKINS, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Chief
Judge Wilkinson wrote the opinion, in which Judge Ervin and Judge
Wilkins joined.

_____

**COUNSEL**

**ARGUED:** Susan Kelly Nichols, Special Deputy Attorney General,
NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North
Carolina, for Appellants. James Bopp, Jr., BOPP, COLESON &
BOSTROM, Terre Haute, Indiana, for Appellees. **ON BRIEF:**
Michael F. Easley, North Carolina Attorney General, James Peeler

2

Smith, Special Deputy Attorney General, Alexander McC. Peters, Special Deputy Attorney General, NORTH CAROLINA DEPART- MENT OF JUSTICE, Raleigh, North Carolina, for Appellants. John K. Abegg, BOPP, COLESON & BOSTROM, Terre Haute, Indiana; Paul Stam, Jr., STAM, FORDHAM & DANCHI, Apex, North Caro- lina, for Appellees. James G. Exum, Jr., John J. Korzen, SMITH, HELMS, MULLISS & MOORE, Greensboro, North Carolina; Marta Nelson, Glenn Moramarco, Nancy Northup, Brennan Center for Jus- tice, NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York, for Amicus Curiae Alliance. Hugh Stevens, EVERETT, GASKINS, HANCOCK & STEVENS, L.L.P., Raleigh, North Caro- lina; Deborah K. Ross, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, Raleigh, North Carolina, for Amicus Curiae ACLU.

_____

**OPINION**

WILKINSON, Chief Judge:

Appellees North Carolina Right to Life (NCRL), its political action committee, and its president brought suit in federal district court chal- lenging the constitutionality of several provisions of North Carolina election and campaign finance law. The district court found for NCRL on each of its claims. North Carolina Right to Life, Inc. v. Bartlett, 3 F. Supp. 2d 675 (E.D.N.C. 1998). The State of North Caro- lina appeals. For the reasons that follow, we affirm in part and reverse in part.

I.

NCRL is a nonprofit corporation operating in the State of North Carolina. NCRL has as a purpose the protection of human life. In fur- therance of that purpose, it provides information to the public about abortion and euthanasia. NCRL is not associated with any political candidate, political party, or campaign committee. Nor is one of NCRL's major purposes to nominate, elect, or defeat specific candi- dates for public office or to pass or defeat ballot measures. In other words, NCRL does not engage in "express advocacy" -- advocacy

3

"that in express terms [calls for] the election or defeat of a clearly identified candidate for . . . office." Buckley v. Valeo, 424 U.S. 1, 44 (1976) (per curiam). Rather, NCRL engages in "issue advocacy" -- the discussion of issues of public concern, including candidates' positions on those issues -- by, among other means, distributing voter guides to the general public. Thus, issue advocacy may influence an election even though it does not expressly advocate the election or defeat of a particular candidate or party. See Virginia Society for Human Life, Inc. v. Caldwell, 152 F.3d 268, 270 (4th Cir. 1998).

NCRL created North Carolina Right to Life Political Action Committee (NCRLPAC) to engage in express advocacy consistent with NCRL's views. NCRLPAC, therefore, does have as a primary purpose supporting or opposing specific candidates and political parties. Toward that end, NCRLPAC contributes money to the campaigns of candidates with whom it agrees and makes "independent expenditures" -- expenditures made independently of candidates that finance an express call for their election or defeat -- to support them. NCRL's president, Barbara Holt, oversees the operations of both NCRL and NCRLPAC. Holt is also a registered lobbyist in the State of North Carolina.

While preparing for North Carolina's 1996 general election, NCRL became concerned that some of the activities in which it wished to engage might violate North Carolina's election law. Specifically, NCRL worried that it might be considered a "political committee" under North Carolina law if it were to distribute its voter guide. N.C. Gen. Stat. § 163-278.6(14). If NCRL were a political committee, it would need to register as such, keep detailed accounts of its expenditures and contributions, and regularly file organizational and financial reports with the State. Id. §§ 163-278.7(b), .8, .9, .11. If NCRL failed to satisfy these requirements, its officers would be subject to criminal penalties. Id. §§ 163-278.27, .34.

In addition, NCRL was concerned that, by publishing its voter guide, it might violate the provision prohibiting corporations from making any contributions or expenditures for a "political purpose," id. §§ 163-269, -278.19, which the statute defines as any attempt to "influence an election," id. § 163-278.6(16). Were the State to determine that NCRL's voter guide was for a political purpose, NCRL's officers

4

would be similarly subject to criminal penalties. Id. §§ 163-269, -278.19(c).

To determine whether it would violate these provisions by distributing a voter guide, NCRL twice wrote to Yvonne Southerland, Chief Deputy Director of the State Board of Elections, to request her opinion. Along with each letter, NCRL sent a sample voter guide. The first sample guide inadvertently contained a one-page candidate endorsement list -- i.e., express advocacy -- prepared by NCRL-PAC. Southerland informed NCRL that the distribution of this voter guide would violate the State's prohibition against corporate expenditures for a political purpose. Southerland also stated more generally that any expenditure for a political purpose would make NCRL a political committee. Realizing that its first sample voter guide accidentally contained NCRLPAC's express advocacy, NCRL sent a second letter to Southerland and attached a voter guide without any candidate endorsements. In this second letter, NCRL asked only whether the distribution of this second guide would violate North Carolina's prohibition against corporate expenditures for a political purpose. Southerland again answered affirmatively.

NCRL, NCRLPAC, and Holt then brought suit in federal district court challenging several provisions of North Carolina's election law. They named as defendants the members of the State Board of Elections, the State Attorney General, and the district attorney for the prosecutorial district in which Holt lives. First, NCRL challenged North Carolina's definition of political committee on the ground that it includes entities that engage in issue advocacy only. Id. § 163-278.6(14). Second, it challenged the State's total ban on corporate expenditures for a political purpose because it prohibits NCRL from engaging in both issue advocacy and express advocacy. Id. §§ 163-269, -278.6(16), -278.19. Third, NCRLPAC and Holt challenged the provision prohibiting lobbyists, and the political committees that employ them, from contributing to members and candidates for the General Assembly and Council of State while the General Assembly is in session. Id. § 163-278.13B(c). They also challenged the provision prohibiting members and candidates for the General Assembly and Council of State from soliciting contributions from lobbyists and the political committees that employ them. Id. § 163-278.13B(b). Finally, NCRLPAC objected to North Carolina's requirement that all

5

political committees provide prospective donors with the name of the candidate for whom the money will be used. Id. § 163-278.20(a). On each of their claims, NCRL, NCRLPAC, and Holt sought declaratory and injunctive relief.

With respect to North Carolina's definition of political committee, the district court declared section 163-278.6(14) to be unconstitutional because it defines as political committees those entities that engage in issue advocacy as well as express advocacy. NCRL, 3 F. Supp. 2d at 679-80. With regard to North Carolina's ban on corporate contributions and expenditures, the district court declared it to be unconstitutional because it prohibits all corporations, including non-profits, from making expenditures for a political purpose. Id. at 681. As to North Carolina's prohibition on lobbyists and the political committees that employ them contributing to candidates and incumbents during the General Assembly session, the district court declared section 163-278.13B unconstitutional as an undue burden on Holt's and NCRLPAC's First Amendment rights. Id. at 682. Finally, with respect to North Carolina's requirement that political committees alert donors of the use to which their donation will be put, the district court granted NCRLPAC a declaratory judgment that it need only alert prospective donors of its name and need not tell them for whom the money will be used. Id. at 677. North Carolina now appeals.

II.

The State argues initially that no case or controversy exists with respect to several of the provisions NCRL and NCRLPAC challenge. Initially, the State claims that, irrespective of the statute's plain language, it interprets the definition of political committee in section 163-278.6(14) to allow NCRL to distribute a voter guide free of candidate endorsements, or to engage in other forms of issue advocacy, without registering or filing the required reports. Indeed, the State points out that in the twenty-five years since the statute's enactment, it has never interpreted it to apply to groups engaging only in issue advocacy. Consequently, NCRL proffers nothing more than a hypothetical risk of prosecution under section 163-278.6(14).

We disagree. When a plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement

challenge to that statute. See Doe v. Bolton, 410 U.S. 179, 188 (1973). A non-moribund statute that "facially restrict[s] expressive activity by the class to which the plaintiff belongs" presents such a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary. New Hampshire Right to Life PAC v. Gardner, 99 F.3d 8, 15 (1st Cir. 1996). This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights. See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987).

Section 163-278.6(14) appears by its terms to apply to NCRL. North Carolina law provides that any entity "the primary or incidental purpose of which is to . . . influence or attempt to influence the result of an election," N.C. Gen. Stat. § 163-278.6(14), must register and file certain reports with the State, or its officers risk criminal prosecution. Since the record in this case demonstrates that NCRL has distributed voter guides -- which attempt to influence elections -- the statute facially restricts "expressive activity by the class to which the plaintiff belongs." Gardner, 99 F.3d at 15.

More importantly, NCRL has stated that it wants to distribute these guides in the future, and would do so but for its fear that it would fall within North Carolina's definition of political committee. To determine whether that fear was well-founded, NCRL wrote the State Board of Elections. The State did not indicate that it would interpret the statute to mean anything other than what its plain language would suggest. As a result, NCRL refrained from disseminating its guide, and its speech was chilled.

The State's litigation position -- that it does not interpret section 163-278.6(14) to encompass issue advocacy -- fails to alter our analysis in this case. The record does not indicate that the Board has promulgated a rule exempting from its definition of political committee those entities that engage in issue advocacy only. See, e.g., Wisconsin Right to Life, Inc. v. Paradise, 138 F.3d 1183, 1185 (7th Cir.), cert. denied, 119 S. Ct. 172 (1998). Nor does the record indicate that the local district attorneys have any intention of refraining from prosecuting those who appear to violate the plain language of the statute. See id.

7

NCRL is left, therefore, with nothing more than the State's promise that NCRL's officers will face no criminal penalties if NCRL distributes its voter guide without registering as a political committee. NCRL's First Amendment rights would exist only at the sufferance of the State Board of Elections. It has no guarantee that the Board might not tomorrow bring its interpretation more in line with the provision's plain language. Without such a guarantee, NCRL will suffer from the reasonable fear that it can and will be prosecuted for failing to register and file the necessary disclosures, and its constitutionally protected speech will be chilled as a result.

This same analysis applies to the State's argument that no case or controversy exists with respect to its prohibition on corporate contributions and expenditures for a political purpose. See N.C. Gen. Stat. §§ 163-269, -278.6(16), -278.19. As noted, section 163-278.6(16) defines political purpose to include seeking to influence an election -- language which certainly appears to cover NCRL's endorsement-free voter guide. More importantly, in its response to NCRL's second letter, the State indicated that it would consider NCRL's endorsement-free guide to be for a political purpose and therefore prohibited by sections 163-269 and 163-278.19. Again, the only thing standing in the way of a criminal prosecution is the State's litigation position that it will voluntarily refrain from enforcing the statute according to its plain language.

Finally, the State claims that no case or controversy exists with regard to section 163-278.20(a). Section 163-278.20(a), in relevant part, requires "any group" or "committee" soliciting contributions to advise those solicited of either the name of the candidate for whom the funds will be used, id. § 163-278.20(a)(1), the name of the political committee or party for which they will be used, id. § 163-278.20(a)(2), or that a decision will be reached as to the candidate, committee, or party to be supported at some later date no later than twenty days prior to the upcoming primary or general election, id. § 163-278.20(a)(3). Section 163-278.20(b) provides that a violation of this provision is a criminal offense.

The State argues that only section 163-278.20(a)(2) applies to NCRLPAC, and that it interprets that section to require political committees such as NCRLPAC to do nothing more than identify them-

8

selves when they solicit funding. In a prior interpretive letter, however, the State informed another political committee that it must comply with each subsection of 163-278.20(a) -- not just (a)(2). Consequently, as was true with respect to NCRL above, NCRLPAC is protected from possible prosecution by nothing more than the State's post-suit position that the section does not apply as its plain language would suggest.

In sum, this case presents a statute aimed directly at plaintiffs who "will have to take significant . . . compliance measures or risk criminal prosecution." Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 392 (1988). In such a circumstance, courts have long recognized that the statute's mere existence risks chilling First Amendment rights. Indeed, in this case, NCRL has discontinued distributing its voter guide and NCRLPAC has stopped soliciting without providing a disclaimer because of a credible threat of prosecution. Consequently, a case or controversy inheres in each provision.[1]

_____

[1] The State also argues that we should abstain from ruling on appellees' claims concerning sections 163-269, 163-278.6(14), and 163-278.19 because no state court has construed these provisions and such a construction may either render unnecessary this court's constitutional determination or substantially alter the questions before us. Railroad Comm'n v. Pullman Co., 312 U.S. 496 (1941). Recognizing that North Carolina has no procedure by which we may certify these questions to its Supreme Court, the State suggests that we solicit the State Board of Elections for its interpretation of these provisions under section 163-278.23. N.C. Gen. Stat. § 163-278.23. Quite apart from the problem of applying Pullman abstention to the unauthoritative declarations of a state administrative body, section 163-278.23 provides no mechanism for a federal court to certify a question to the Board. And in all events, courts "have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment," City of Houston v. Hill , 482 U.S. 451, 467 (1987), because the delay involved "might itself effect the impermissible chilling of the very constitutional right [the litigant] seeks to protect," Zwickler v. Koota, 389 U.S. 241, 252 (1967). Consequently, abstention in this case is inappropriate.

III.

We next proceed to the merits of NCRL, NCRLPAC, and Holt's constitutional challenges. Section 163-278.6(14) defines political committee as "a combination of two or more individuals, or any person, committee, association, or organization, the primary or incidental purpose of which is to support or oppose any candidate or political party or to influence or attempt to influence the result of an election." N.C. Gen. Stat. § 163-278.6(14). The consequences of finding NCRL a political committee are substantial -- NCRL would be required to register as such, keep detailed records of its expenditures and contributions, and file organizational and financial reports with the State. Id. §§ 163-278.7(b), .8, .9, .11.

The district court found section 163-278.6(14)'s definition of political committee to be impermissibly broad because it includes groups such as NCRL that engage in issue advocacy only. NCRL, 3 F. Supp. 2d at 679-80. The State appeals, claiming that the district court should have narrowly construed North Carolina's definition of political committee so as not to include groups that only engage in issue advocacy.

Specifically, the State requests that we follow the path of the Supreme Court which in Buckley v. Valeo narrowly construed a similar provision. In Buckley, the Supreme Court addressed a provision that required any entity falling within the Federal Election Campaign Act's (FECA) definition of "political committee" to make certain disclosures to the federal government. FECA defined a political committee as any entity making contributions or expenditures above a certain amount "for the purpose of . . . influencing" the nomination or election of individuals to federal office. Buckley , 424 U.S. at 63. The Court held that, without a narrowing construction, the general requirement that political committees "disclose their expenditures could raise . . . vagueness problems, for `political committee' is defined [in such a way that it] could be interpreted to reach groups engaged purely in issue discussion." Id. at 79.

To save the provision from being unconstitutionally vague, the Court defined political committee as including only those entities that have as a major purpose engaging in express advocacy in support of a candidate, id., by using words such as"vote for," "elect," "support,"

10

"vote against," "defeat," or "reject," id. at 44 n.52. Otherwise, "absent the bright-line limitation, the distinction between issue discussion (in the context of electoral politics) and candidate advocacy would be sufficiently indistinct that the right of citizens to engage in the vigorous discussion of issues of public interest without fear of official reprisal would be intolerably chilled." FEC v. Christian Action Network, 110 F.3d 1049, 1051 (4th Cir. 1997) (emphasis omitted).

The question then is whether we may similarly construe North Carolina's definition of political committee to save it from being void for vagueness. We cannot. Two crucial differences exist between section 163-278.6(14) and the provisions of FECA at issue in Buckley. First, unlike the provisions of FECA, North Carolina's definition expressly sweeps within its ambit those groups that only incidentally engage in express advocacy. This is a much broader definition of political committee than that at issue in Buckley, and to save it would require quite a stretch -- in fact, we would have to excise the word "incidental" from the statute.

Second, the North Carolina definition of political committee covers groups engaging in issue advocacy by explicitly juxtaposing express and issue advocacy, and thereby indicating that it encompasses both. Specifically, the definition covers any group "the primary or incidental purpose of which is to support or oppose any candidate . . . or to influence or attempt to influence the result of an election." N.C. Gen. Stat. § 163-278.6(14) (emphasis added). The only reasonable reading of this definition is that political committee encompasses both entities that have as a primary or incidental purpose supporting a candidate -- i.e., engaging in express advocacy -- and those that merely wish to influence an election -- i.e., engage in issue advocacy. To accept the State's proffered interpretation would read the references to influencing elections (a classic form of issue advocacy) right out of the statute.

Without the benefit of a narrowing construction, section 163-278.6(14) is unconstitutionally vague and overbroad. See Buckley, 424 U.S. at 79-80. The statute subjects groups engaged in only issue advocacy to an intrusive set of reporting requirements. In so doing, it "blankets with uncertainty" the entire field of campaign politics "compel[ling] the speaker to hedge and trim." Thomas v. Collins, 323

11

U.S. 516, 535 (1945). Burdening speech of this sort is unacceptable in an area of such crucial import to our representative democracy. The district court was correct in finding section 163-278.6(14) facially unconstitutional, and we affirm its judgment.

IV.

North Carolina prohibits corporate expenditures or contributions for a political purpose. N.C. Gen. Stat. §§ 163-269, -278.6(16), -278.19. Sections 163-269 and 163-278.19 prohibit corporations from making "any contribution or expenditure . . . for any political purpose whatsoever." Section 163-278.6(16) defines "political purpose" in relevant part as "any purpose in aid of seeking to influence an election." Because North Carolina's ban on corporate expenditures makes no exception for nonprofit corporations, the district court declared sections 163-269, 163-278.6(16), and 163-278.19 to be unconstitutionally overbroad. NCRL, 3 F. Supp. 2d at 681. The State appeals.

The Supreme Court has recognized that, in the realm of campaign politics, "the special characteristics of the corporate structure require particularly careful regulation." FEC v. National Right to Work Comm., 459 U.S. 197, 209-10 (1982). The economic advantages of the corporate form such as "limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets" all enhance a corporation's ability "to attract capital and to deploy . . . resources." Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 658-59 (1990). These advantages enable corporations to create enormous "war chests" and "to incur political debts from legislators who are aided by [their] contributions" and expenditures. National Right to Work Comm., 459 U.S. at 207. The danger, of course, is that there is no guarantee that any relationship exists between the amount of corporate expenditures in favor of a position and the popularity of that position with the public at large. FEC v. Massachusetts Citizens for Life, 479 U.S. 238, 258 (1986) [hereinafter MCFL]. Recognizing this, the Supreme Court has, in some circumstances, upheld complete prohibitions on both corporate political contributions, National Right to Work Comm., 459 U.S. 197, and independent expenditures, Austin, 494 U.S. 652.

Nevertheless, the Court has been careful to note that "[r]egulation of corporate political activity . . . has reflected concern not about use

12

of the corporate form per se, but about the potential for unfair deployment of wealth for political purposes." MCFL , 479 U.S. at 259. Moreover, such a concern is not omnipresent. For instance, in MCFL, the Court considered a prohibition on corporate expenditures in connection with federal elections. MCFL, like NCRL, was a nonprofit corporation founded for the purpose of fostering respect for human life by opposing abortion. MCFL did not accept contributions from for-profit corporations. MCFL, 479 U.S. at 242.

After reiterating its general concern with the distorting effect of the corporate form in politics, the Court held that its analysis with respect to corporate expenditures must be more nuanced. Specifically, it held that MCFL was sufficiently distinct from the traditional for-profit corporation. First, MCFL could not engage in for-profit activity, and it was created simply to disseminate political ideas. Second, it had no shareholders or other persons who held a claim on its assets or earnings. Finally, it was not established by a business or a labor union, and it had a policy of refusing to accept contributions from either type of entity. Such organizations, the Court held, do not pose the same dangers to the political system since they are organized to promote a political message and their revenues typically reflect the public's support of that message. Id. at 264.

Like the federal election law in MCFL, North Carolina's law makes no exception for nonprofits that present a minimal risk of distorting the political process. Rather, it bars all corporations from making any expenditures and contributions for a political purpose. As such, it is substantially overbroad and thus unconstitutional.

The State, in an apparent last-ditch effort to save its statute, argues that NCRL is ineligible for the MCFL exception because, unlike MCFL, NCRL has no policy against accepting contributions from for-profit corporations. Indeed, from 1993 to 1995, NCRL's contributions from such entities fluctuated from zero to eight percent of its overall revenues.

We do not think this modest percentage of revenue disqualifies NCRL for the nonprofit exemption to North Carolina's ban on corporate expenditures. We agree with those circuits that have addressed the question, each of which has held that the list of nonprofit corpo-

13

rate characteristics in <u>MCFL</u> was not "a constitutional test for when a nonprofit corporation must be exempt," but"an application, in three parts, of First Amendment jurisprudence to the facts in <u>MCFL</u>." <u>Day v. Holahan</u>, 34 F.3d 1356, 1363 (8th Cir. 1994); <u>see also FEC v. Survival Educ. Fund, Inc.</u>, 65 F.3d 285, 292 (2d Cir. 1995). The crucial question is not whether NCRL has a policy against accepting corporate contributions, but whether its acceptance of those contributions means that it is serving as a conduit "for the type of direct spending [by for-profit corporations] that creates a threat to the political marketplace." <u>MCFL</u>, 479 U.S. at 264.

Such is clearly not the case with respect to NCRL. Those corporate contributions it has received are but a fraction of its overall revenues. In addition, the contributions are not of the traditional form. They are instead part of a program by which phone company customers may direct their phone bill refunds to a nonprofit of their choice. Consequently, while these contributions technically come from the phone company, they in fact result from the decisions of individual phone company customers. Moreover, NCRL displays all the typical characteristics of the nonprofit form -- it does not engage in profit-making activity, it has no shareholders or other persons who might have a claim on its assets and earnings, and it is exempt from federal income taxation. As a result, NCRL falls squarely within the <u>MCFL</u> exception. And because North Carolina law fails "to distinguish between corporations which pose a threat to the integrity of the political process and those which do not," we agree with the district court that sections 163-269, 163-278.6(16), and 163-278.19 are unconstitutionally overbroad. <u>NCRL</u>, 3 F. Supp. 2d at 680.

V.

Section 163-278.13B prohibits a lobbyist, a lobbyist's agent, or a political committee that employs a lobbyist from contributing to a member of or candidate for the North Carolina General Assembly or Council of State while the General Assembly is in session. N.C. Gen. Stat. § 163-278.13B(c). It also prohibits candidates or incumbents from soliciting lobbyists or political committees that employ them during the session. <u>Id.</u> § 163-278.13B(b). Violation of these restrictions carries a criminal penalty. <u>Id.</u> § 163-278.13B(e). The record indicates that the General Assembly was in session for one to two

14

months for most of the years from 1975 to 1997 in which an election was held. In 1998 it apparently extended its session, and in nonelection years it routinely meets for a longer period of time. When the General Assembly is not in session, lobbyists and political committees may contribute up to $4,000 per election to any candidate. Id. § 163-278.13(a).

Holt and NCRLPAC challenged North Carolina's prohibition on lobbyist and PAC contributions to members and candidates for the General Assembly while it is in session. They also challenged North Carolina's solicitation restriction.**2** The district court struck section 163-278.13B as violating the First Amendment. NCRL, 3 F. Supp. 2d at 682. We hold, however, that North Carolina can constitutionally enact the limited restrictions on lobbyist and political committee contributions embodied in sections 163-278.13B(b) and (c).

A.

Initially, appellees argue that section 163-278.13B impermissibly burdens their First Amendment rights of speech and association. Appellees are correct that political contribution limits do implicate one's speech and association rights. See Buckley , 424 U.S. at 14-15, 24-25. As such, courts have applied strict scrutiny to such limits. See, e.g., Carver v. Nixon, 72 F.3d 633, 637 (8th Cir. 1995). Nevertheless, it is settled that "[n]either the right to associate nor the right to participate in political activities is absolute." CSC v. National Ass'n of Letter Carriers, 413 U.S. 548, 567 (1973). In fact, the activities of lobbyists are extensively regulated. See, e.g., Lobbying Disclosure Act of 1995, 2 U.S.C. §§ 1601-1612 (requiring lobbyists to make detailed disclosures related to their lobbying efforts).

Moreover, the Supreme Court has long noted that restrictions on political contributions are constitutionally less problematic than are,

_____

**2** We cannot accept the State's argument that appellees have no standing to challenge North Carolina's solicitation restriction because they are not members of or candidates for the General Assembly or Council of State. North Carolina's solicitation restriction is inextricably intertwined with its contribution limitation. Indeed, the two are the mirror reflection of one another.

15

for instance, restrictions on independent expenditures. See Buckley, 424 U.S. at 20-21. This lesser concern springs from the fact that contribution limits typically "entail[ ] only a marginal restriction upon the contributor's ability to engage in free communication." Id. Such is the case here. North Carolina's restrictions do nothing more than place a temporary hold on appellees' ability to contribute during the General Assembly session, leaving them free to contribute during the rest of the calendar year and to engage in political speech for the entire year.

North Carolina's contribution and solicitation restrictions also survive strict scrutiny because they advance a compelling state interest. Prohibiting lobbyist contributions and solicitations while the General Assembly is in session serves to prevent corruption and the appearance of corruption -- "the only legitimate and compelling government interests thus far identified for restricting campaign finances." FEC v. National Conservative PAC, 470 U.S. 480, 496-97 (1985); see also Buckley v. American Constitutional Law Found., Inc., 119 S. Ct. 636, 648 (1999)(noting the risk of quid pro quo corruption "when money is paid to, or for, candidates"). Legislative action which is procured directly through gifts, or even campaign contributions, too often fails to reflect what is in the public interest, what enjoys public support, or what represents a legislator's own conscientious assessment of the merits of a proposal.

Appellees respond that the compelling interest the Court identified in Buckley was not the prevention of corruption or its appearance generally, but the prevention of only that corruption or appearance of corruption that results from large contributions by individuals. Holt and NCRLPAC, however, define the interest too narrowly. Corruption, either petty or massive, is a compelling state interest because it distorts both the concept of popular sovereignty and the theory of representative government.

In evaluating the state interest in this case, we find a genuine risk of both actual corruption and the appearance of corruption. With respect to actual corruption, lobbyists are paid to effectuate particular political outcomes. The pressure on them to perform mounts as legislation winds its way through the system. If lobbyists are free to contribute to legislators while pet projects sit before them, the temptation

16

to exchange "dollars for political favors" can be powerful. <u>National Conservative PAC</u>, 470 U.S. at 497.

Illicit bargaining of this type is not limited to the old days when trusts shopped state legislatures like children in a candy store. More recent cases of improper activity, unfortunately, also exist. Indeed, courts have recognized instances of influence peddling, <u>Maryland Right to Life State PAC v. Weathersbee</u>, 975 F. Supp. 791, 797 (D. Md. 1997), political quid pro quos, <u>United States v. Nelson</u>, 486 F. Supp. 464, 468 (W.D. Mich. 1980), and other improper behavior on the part of legislators, <u>United States v. Bailey</u> , 990 F.2d 119, 121 (4th Cir. 1993) (detailing personal cash payments for support of pari-mutuel betting legislation); <u>Kentucky Right to Life, Inc. v. Terry</u>, 108 F.3d 637, 639 (6th Cir.) ("Numerous Kentucky public officials have been convicted of abusing their political offices for personal gain over the past twenty-five years."), <u>cert. denied</u> , 118 S. Ct. 162 (1997). While lobbyists do much to inform the legislative process, and their participation is in the main both constructive and honest, there remain powerful hydraulic pressures at play which can cause both legislators and lobbyists to cross the line. State governments need not await the onset of scandal before taking action.

The appearance of corruption resulting from PAC and lobbyist contributions during the legislative session can also be corrosive. Even if lobbyists have no intention of directly"purchasing" favorable treatment, appearances may be otherwise. The First Amendment does not prevent states such as North Carolina from recognizing these dangers and taking reasonable steps to ensure that the appearance of corruption does not undermine public confidence in the integrity of representative democracy. <u>See Buckley</u>, 424 U.S. 26-27.

Toward these ends, North Carolina enacted narrowly tailored restrictions. First, the restrictions in section 163-278.13B are limited to lobbyists and the political committees that employ them -- the two most ubiquitous and powerful players in the political arena. Second, the restrictions are temporally limited: they last only during the legislative session, which typically, though not invariably, has covered just a few months in an election year. In short, the restrictions cover only that period during which the risk of an actual quid pro quo or the appearance of one runs highest.

17

Holt and NCRLPAC counter that the limitations are not narrowly tailored for two reasons. First, they maintain that the restrictions cover any contribution, not just those large enough to support a potential quid pro quo. But a "court has no scalpel to probe" such fine distinctions. Buckley, 424 U.S. at 30 (internal quotation marks omitted). And even were we able to distinguish those dollar amounts that are sufficient to support actual purchases of political favors from those that are not, the appearance of corruption may persist whenever a favorable legislative outcome follows closely on the heels of a financial contribution. Courts simply are not in the position to "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." National Right to Work Comm., 459 U.S. at 210.

Second, Holt and NCRLPAC claim the restrictions are not narrowly tailored because they prevent candidates for office from receiving contributions even though candidates are in no position to sell legislative outcomes. Appellees' argument might be persuasive were contributions to incumbents the only way to gain favorable treatment. But sticks can work as well as carrots, and the threat of contributing to a legislator's challenger can supply as powerful an incentive as contributing to that legislator himself.

Finally, appellees argue that North Carolina's restrictions are constitutionally infirm because they allegedly make fundraising a more difficult proposition for challengers than it is for incumbents. The restrictions work a particular disadvantage upon challengers, so the argument runs, because they effectively deprive them of a major funding source in the critical months leading up to an election or primary. Incumbents, by contrast, would allegedly benefit from a huge infusion of contributions shortly after the General Assembly session ends.

This precise argument was squarely rejected by the Supreme Court in Buckley. In Buckley, the Court faced a provision of FECA that limited to $1000 the contribution any one person could make to any candidate with respect to a federal election. 424 U.S. at 23-24. The plaintiffs in Buckley argued that the FECA limitation was unconstitutional because it allegedly made fundraising more difficult for challengers vis a vis incumbents. Id. at 30-31. In rejecting plaintiffs'

18

claim, the Court found important the fact that FECA, like North Carolina's restriction, "applies the same limitations on contributions to all candidates" -- incumbents and challengers alike. Id. at 31. Indeed, the Court emphasized that "[s]ince the danger of corruption and the appearance of corruption apply with equal force to challengers and to incumbents, Congress had ample justification for imposing the same fundraising constraints upon both." Id. at 33 (emphasis added). In addition, the Court took issue with the plaintiffs' claim that fundraising is necessarily more difficult for challengers. It noted that "major-party challengers as well as incumbents are capable of raising large sums for campaigning" and that "a small but nonetheless significant number of challengers have in recent elections outspent their incumbent rivals." Id. at 32. Finally, as a practical matter, the Court's view was informed by the realization that if challengers and incumbents were required to play by different sets of campaign finance rules, few reforms would be likely to win legislative enactment.

B.

Appellees also claim that section 163-278.13B violates the Fourteenth Amendment because it treats lobbyists and political committees differently than it does the general population with respect to their fundamental right to associate. As the preceding section notes, however, the State has advanced strong reasons for doing so -- reasons that the Supreme Court has in fact expressly validated. National Conservative PAC, 470 U.S. at 496-97.

C.

Appellees' last challenge to section 163-278.13B is equally unavailing. Holt and NCRLPAC argue that the provision impermissibly forces lobbyists to forego their constitutional right to petition the government for a redress of grievances if, during the General Assembly session, they wish to exercise their First Amendment right to associate by contributing to candidates and incumbents. They argue that such a system creates an "intolerable [situation in which] one constitutional right [must] be surrendered in order to assert another." Simmons v. United States, 390 U.S. 377, 394 (1968).

As an initial matter, it is instructive to note that Holt's position is in many respects similar to that of federal employees. Under the

19

Hatch Act, one must forego certain rights to participate in the political process if one wishes to take federal employment. Despite the obvious trade-off such a scheme forces prospective federal employees to make, the Supreme Court has upheld the Hatch Act's restrictions as constitutional. <u>Letter Carriers</u>, 413 U.S. 548.

More generally, "[n]either the right to associate nor the right to participate in political activities is absolute." <u>Letter Carriers</u>, 413 U.S. at 567. When the interests sought to be advanced by the statutory scheme are sufficiently important, minimal burdens on one's right to associate are constitutional. <u>Id.</u> at 564-65. Not only are the interests served by North Carolina's statutory scheme important, they are compelling. Moreover, the burden on appellees' right to associate is minimal. Appellees are not prevented from contributing to the candidates and incumbents of their choice, they are only restrained from doing so while the Assembly is in session.

In conclusion, this effort on the part of a state legislature to protect itself from the damaging effects of corruption should not lightly be thwarted by the courts. Here, the proper judicial posture should be one of restraint. The Constitution does not prevent this attempt on the part of North Carolina to preserve the integrity of and maintain public confidence in its legislative process. In the end, North Carolina law does nothing more than recognize that lobbyists are paid to persuade legislators, not to purchase them.

VI.

The following represents a summation of our holdings. We hold North Carolina's definition of political committee in section 163-278.6(14) to be unconstitutionally vague and overbroad, and we affirm the judgment of the district court. North Carolina's prohibition on corporate expenditures and contributions in sections 163-269, 163-278.6(16), and 163-278.19 is substantially overbroad, and we again affirm the district court. Finally, the State's contribution and solicitation limitations set forth in section 163-278.13B are constitutional, and we thus reverse the district court.**3**

_____

**3** Before the trial court, NCRLPAC also challenged North Carolina's requirement that political committees provide donors with the name of

20

Each of the provisions we strike works in its own way to impede the free and open discussion of issues and candidates that sustains our ability as citizens to control our own destiny. The one provision we do uphold is a reasonable measure to ensure that this free and open debate does not go for naught.

The judgment of the district court is hereby

AFFIRMED IN PART AND REVERSED IN PART.

_____

the candidate for whom their contribution would be used. N.C. Gen. Stat. § 163-278.20(a). The district court granted NCRLPAC a declaratory judgment that section 163-278.20(a) requires it merely to provide prospective donors with its own name. NCRL, 3 F. Supp. 2d at 677. On appeal, the State challenges only the presence of a case or controversy -- it offers no objection to the merits of the district court's decision. As noted, a case or controversy does exist with regard to this section. We agree with the district court that NCRLPAC cannot be required to identify to potential contributors the names of specific candidates or parties for whom the contributions will be used.

21