278 F.3d 261
Christine BEAUMONT; Loretta Thompson; Stacy Thompson; Barbara Holt; North Carolina Right To Life, Incorporated, Plaintiffs-Appellees,v.FEDERAL ELECTION COMMISSION, Defendant-Appellant.Christine Beaumont; Loretta Thompson; Stacy Thompson; Barbara Holt; North Carolina Right To Life, Incorporated, Plaintiffs-Appellants,v.Federal Election Commission, Defendant-Appellee.
No. 01-1348.
No. 01-1479.
United States Court of Appeals, Fourth Circuit.
Argued October 31, 2001.
Decided: January 25, 2002.

COPYRIGHT MATERIAL OMITTED ARGUED: David Brett Kolker, Federal Election Commission, Washington, D.C., for Defendant-Appellant. James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, Indiana, for Plaintiffs-Appellees. ON BRIEF: Lois G. Lerner, Acting General, Richard B. Bader, Associate General, Federal Election Commission, Washington, D.C., for defendant-Appellant. Richard E. Coleson, James R. Mason, III, Bopp, Coleson & Bostrom, Terre Haute, Indiana; Paul Stam, Jr., Stam, Fordham & Danchi, P.A., Apex, North Carolina, for Plaintiffs-Appellees.
Before WILKINSON, Chief Judge, and WIDENER and GREGORY, Circuit Judges.
Affirmed by published opinion. Chief Judge WILKINSON wrote the majority opinion, in which Judge WIDENER concurred as to Parts I, II, and IV, and in which Judge GREGORY concurred as to Parts II.C.1, II.C.2, and III. Judge WIDENER wrote an opinion concurring and dissenting. Judge GREGORY wrote an opinion concurring in part and dissenting in part.
OPINION
WILKINSON, Chief Judge.

1
Plaintiffs North Carolina Right to Life, a nonprofit advocacy corporation, its officers, and an eligible voter in North Carolina filed a challenge to 2 U.S.C. § 441b(a) of the Federal Election Campaign Act and two implementing regulations. The district court held that these provisions violated the plaintiffs' First Amendment right to make expenditures and contributions in connection with federal elections. However, the court declined to facially invalidate § 441b(a) and the regulations. We conclude that these provisions burden the First Amendment speech and association interests of nonprofit advocacy groups. We further hold that the prohibition on independent expenditures is not narrowly tailored to serve a compelling governmental interest, and that the proscription on contributions is not closely drawn to match a sufficiently important interest. Buckley v. Valeo, 424 U.S. 1, 24-25, 44-45, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 387-88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). However, because the provisions at issue are constitutional in the overwhelming majority of applications, we decline to invalidate them facially and affirm the judgment of the district court.

I.

2
Plaintiffs North Carolina Right to Life ("NCRL"), Christine Beaumont, Loretta Thompson, Stacy Thompson and Barbara Holt are challenging 2 U.S.C. § 441b(a) of the Federal Election Campaign Act ("FECA") and two implementing regulations, 11 C.F.R. §§ 114.2(b) and 114.10. NCRL is a nonprofit corporation, exempt from federal taxation under § 501(c)(4) of the Internal Revenue Code. NCRL is a charitable organization that, inter alia, provides crisis pregnancy counseling, publishes crisis pregnancy literature, and promotes alternatives to abortion. NCRL has no shareholders and none of its earnings inure to the benefit of any individual. Christine Beaumont is an eligible voter in North Carolina. Loretta Thompson is Vice President of NCRL. Stacy Thompson is a member of NCRL's Board of Directors, and Barbara Holt is President of NCRL.

3
Plaintiffs filed this action against the Federal Election Commission ("FEC" or "Commission") on January 3, 2000, challenging the constitutionality of FECA's prohibitions on corporate independent expenditures and contributions in connection with federal elections. Plaintiffs sought declaratory and injunctive relief, arguing that 2 U.S.C. § 441b(a) and two regulations promulgated thereunder violated their First Amendment right to make independent expenditures and contributions in connection with federal elections. Plaintiffs moved for summary judgment and the FEC moved for partial dismissal and partial summary judgment.

4
Section 441b(a) makes it "unlawful ... for any corporation whatever ... to make a contribution or expenditure in connection with any election" for federal office. And accompanying regulation 11 C.F.R. § 114.2(b) prohibits all corporate contributions to federal candidates and all expenditures made by non-qualified corporations. The exemption for qualified corporations was created in response to the Supreme Court's decision that § 441b(a)'s prohibition on independent expenditures from a corporation's general treasury was unconstitutional as applied to Massachusetts Citizens for Life ("MCFL"), a small, non-profit political advocacy corporation. FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("MCFL"). The Court identified three nonprofit characteristics of MCFL that were essential to its holding that the group could not constitutionally be bound by § 441b(a)'s restriction on independent spending.1 The FEC rigidly codified these three characteristics in 11 C.F.R. § 114.10 Corporations that meet the criteria in 11 C.F.R. § 114.10 are "qualified non-profit corporation[s]" not subject to the prohibition on independent expenditures of § 441b(a) and 11 C.F.R. § 114.2(b). NCRL did not qualify for the 11 C.F.R. § 114.10 exemption and challenged the regulation for that reason.

5
The district court, on October 3, 2000, recognized that "the importance of campaign contributions and expenditures as political speech is beyond question," and held that NCRL had established a First Amendment right to make independent expenditures and limited contributions. Beaumont v. FEC, 137 F.Supp.2d 648, 651, 658 (E.D.N.C.2000). The court then determined that there were two possible remedies: (1) declare the provisions of FECA unconstitutional as applied to NCRL, or (2) declare the provisions of FECA facially unconstitutional. Id. at 658. Instead of determining a remedy on October 3, the court required the parties to address the scope of declaratory relief and stayed the effect of the October 3 ruling until it issued a final order. Id. at 658.

6
On January 21, 2001, the district court held that 2 U.S.C. § 441b(a) and 11 C.F.R. §§ 114.2(b) and 114.10 were unconstitutional as applied to NCRL, and permanently enjoined the FEC from enforcing violations of those sections against NCRL. The district court declined to hold the provisions of FECA facially unconstitutional because NCRL failed to demonstrate that "the constitutional infringements caused by 2 U.S.C. § 441[b(a)] and the related regulations are `substantial' in relation to their `plainly legitimate sweep.'" The FEC appeals and the plaintiffs cross-appeal the district court's decision not to hold 2 U.S.C. § 441b(a) facially unconstitutional.

II.
A.

7
We review de novo the district court's grant of the plaintiffs' motion for summary judgment. See Smith v. Va. Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (en banc). In so reviewing the judgment, we must determine whether the prohibitions of § 441b(a) and 11 C.F.R. §§ 114.2(b) and 114.10 burden the exercise of political speech. If they do, we must first decide whether the proscription on independent expenditures is narrowly tailored to serve a compelling governmental interest. Buckley, 424 U.S. at 44-45, 96 S.Ct. 612; see also MCFL, 479 U.S. at 251-52, 107 S.Ct. 616. We must next consider whether the prohibition on contributions is closely drawn to match a sufficiently important interest. Shrink Missouri, 528 U.S. at 387-88, 120 S.Ct. 897; Buckley, 424 U.S. at 24-25, 96 S.Ct. 612.

B.
1.

8
Any discussion of the First Amendment interests at issue in this case must begin with the Supreme Court's decision in MCFL. The Court took pains there to emphasize the special role that nonprofit advocacy organizations play in the political process. The Court identified several characteristics of these groups that make them special purveyors of political speech. Far from having as their organizing purpose the aggregation of capital or the issuance of equity shares, their central energizing principle is unabashedly political and expressive. These groups, whether incorporated or not, are "formed to disseminate political ideas, not to amass capital." MCFL, 479 U.S. at 259, 107 S.Ct. 616.2

9
As a consequence, nonprofit advocacy organizations play a distinctive role in the political scheme. Like the other participants in our political conversation, they inform and generate "[d]iscussion of public issues and debate on the qualifications of candidates," which are "integral to the operation of the system of government established by our Constitution." Buckley, 424 U.S. at 14, 96 S.Ct. 612. See also North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 713 (4th Cir.1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000) (referring to the field of campaign politics as "an area of ... crucial import to our representative democracy") ("NCRL I"). We live in a republic, where the people are sovereign. See The Federalist No. 39, at 190 (James Madison) (Garry Wills ed., 1982). As a consequence, "the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." Buckley, 424 U.S. at 14-15, 96 S.Ct. 612. Through their expressive activities, groups such as MCFL and NCRL help empower citizens to make informed political choices. That is precisely why the Court has concluded that it is this kind of speech and these types of organizations that lend vitality to our political discourse.

10
That the functioning of these groups is vital to our democratic political process is abundantly clear from looking at the types of activities in which they engage. The Court in MCFL emphasized that MCFL had accepted voluntary donations from members; engaged in fundraising activities such as garage sales, bake sales, dances, raffles, and picnics; organized a public prayer service; sponsored a regional conference; provided speakers for discussion groups, debates, lectures, and media programs; sponsored an annual march; drafted and submitted legislation; sponsored testimony on proposed legislation; urged its members to contact their elected representatives to express their views on legislative proposals; and published a newsletter. 479 U.S. at 242, 107 S.Ct. 616. Similarly, NCRL engages in these same kinds of endeavors. The group is funded overwhelmingly by private contributions from individuals, and has organized such traditional fundraising activities as bake sales, walkathons, and raffles. In addition, NCRL publishes a newsletter, candidate surveys, and voter guides. It also holds conventions, provides counseling and referrals, and publicizes and promotes numerous service groups.

11
Taking stock of such activities reinforces the point that these organizations lie at the expressive heart of our political life. These endeavors are what attract contributions and adherents. It is through projects such as these that groups become important symbols in political life and valuable participants in the daily ebb and flow of political discourse.

2.

12
All of the above activities embody participatory democracy. It follows ineluctably that restrictions of the expenditures and contributions of such organizations in federal election campaigns "operate in an area of the most fundamental First Amendment activities." Buckley, 424 U.S. at 14, 96 S.Ct. 612. The First Amendment "protect[s] our cherished right to political speech." FEC v. Christian Action Network, Inc., 110 F.3d 1049, 1051 (4th Cir.1997). The First Amendment also protects political association, and the regulation of contributions and expenditures implicates both of these interests. Buckley, 424 U.S. at 14-23, 96 S.Ct. 612. It would be foolhardy to pretend that a ban on the ability of advocacy groups to make contributions and expenditures does not impair their capacity to participate in the political process. Making expenditures and funding campaigns are essential means by which citizens in a democracy can make themselves heard.

13
It is revealing that, even where the Court's decisions have not addressed campaign contributions and expenditures, they have underscored the First Amendment values that may be served by them. Without the ability to expend funds, it is almost impossible for political expression in our modern society "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). See also Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (noting the "practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," including "discussions of candidates"); New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (noting our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). Similarly, without the expenditure of funds, "[e]ffective advocacy of both public and private points of view, particularly controversial ones," will not be significantly "enhanced by group association." NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). See also Kusper v. Pontikes, 414 U.S. 51, 56-57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (stating that "[t]here can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is ... protected by the First and Fourteenth Amendments," and that "[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom"). This language from non-funding decisions does not suddenly become inoperative when contributions and independent expenditures are at issue.

14
It is true that there exists a differentiation in the weight the First Amendment accords to contributions and expenditures, and that an interest of the highest First Amendment order attaches to independent expenditures. The Court in Buckley concluded that "although [FECA's] contribution and expenditure limitations both implicate fundamental First Amendment interests, its expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do its limitations on financial contributions." 424 U.S. at 23, 96 S.Ct. 612. See also FEC v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 121 S.Ct. 2351, 2356, 150 L.Ed.2d 461 (2001) ("Colorado II"); Shrink Missouri, 528 U.S. at 386-88, 120 S.Ct. 897; Colorado Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 610, 614-15, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) ("Colorado I"); MCFL, 479 U.S. at 259-60, 107 S.Ct. 616. At the same time, however, the Court has been careful in all of these cases not to expel financial contributions from the circle of First Amendment values. This is so for good reason. Individuals and groups that stand for ideas have a First Amendment interest in pursuing various outlets for those ideas. Independent expenditures are one such channel, and contributions are another.

15
Making a contribution to a candidate not only "serves as a general expression of support for the candidate and his views," but also "serves to affiliate a person with a candidate." Buckley, 424 U.S. at 21-22, 96 S.Ct. 612. In addition, making a contribution to a candidate "enables like-minded persons to pool their resources in furtherance of common political goals." Id. Indeed, while citizens certainly can and do participate as individuals in the process of determining political change, they often do not possess the time, information, and resources to effectively influence public debate. Contributions to an advocacy group from an individual permit the individual to take advantage of the group's closer attention to political developments. And contributions from the advocacy group to a candidate in turn put the individual's donation to a more efficient and informed political effect. As the Court noted in MCFL:

16
[I]ndividuals contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction. Any contribution therefore necessarily involves at least some degree of delegation of authority to use such funds in a manner that best serves the shared political purposes of the organization and contributor.

17
479 U.S. at 261, 107 S.Ct. 616. By making a contribution to an advocacy group, the individual citizen authorizes and empowers the organization receiving the money to serve as his or her proxy in political debate.

18
In sum, nonprofit advocacy organizations such as NCRL have a strong First Amendment interest in expressing their ideas and associating with others who share the same views. These entities significantly enhance the effectiveness of political expression by facilitating political association. And these groups advance both the values of political speech and association not only by making independent expenditures, but also by making contributions to candidates who share their beliefs.

3.

19
With these general principles in mind, it is clear that the statutory and regulatory provisions at issue in this case burden the plaintiffs' First Amendment speech and association interests. Taken together, 2 U.S.C. § 441b(a), 11 C.F.R. § 114.2(b), and 11 C.F.R. § 114.10 ban corporate contributions and expenditures in connection with federal elections, with an exception to the prohibition on corporate expenditures for certain "qualified" nonprofit corporations so narrow that NCRL does not fit into it. In view of the Court's conclusion in Buckley that FECA's "contribution and expenditure limitations both implicate fundamental First Amendment interests," 424 U.S. at 23, 96 S.Ct. 612 (emphasis added), there is no question that a complete ban on NCRL's making contributions and expenditures burdens those very same interests.3

20
The FEC responds that, contrary to the district court's characterization, FECA and its implementing regulations do not impose a blanket prohibition. Rather, the Commission submits that the Act takes a different approach. It allows all corporations to make campaign contributions through a separate segregated fund, and corporations that do not fall within 11 C.F.R. § 114.10's exception to make independent expenditures through such a fund. See §§ 441b(a) and (b)(2)(C). Given the availability of this alternative avenue through which to make contributions and expenditures, the FEC maintains that it is factually incorrect to contend that an absolute ban is at issue in this case.

21
However, the FEC's view has already been rejected by the Supreme Court in MCFL. While restricting MCFL's campaign spending to use of a separate segregated fund "is not an absolute restriction on speech, it is a substantial one. Moreover, even to speak through a segregated fund, MCFL must make very significant efforts." MCFL, 479 U.S. at 252, 107 S.Ct. 616 (plurality opinion).4 A segregated fund is a "political committee" under the Act. 2 U.S.C. § 431(4)(B). As a consequence, organizations that use a segregated fund must adhere to significant reporting requirements, staffing obligations, and other administrative burdens. These burdens stretch far beyond the more straightforward disclosure requirements on unincorporated associations. See MCFL, 479 U.S. at 252-53, 107 S.Ct. 616. As noted in MCFL, 479 U.S. at 253-54, 107 S.Ct. 616, these additional burdens include:

22
• appointing a treasurer, § 432(a);

23
• forwarding contributions to the treasurer within 10 or 30 days of receiving them, depending on the amount, § 432(b)(2);

24
• ensuring that the treasurer keeps an account of (1) every contribution regardless of amount; (2) the name and address of anyone who makes a contribution in excess of $50; (3) all contributions received from political committees; and (4) the name and address of every person to whom a disbursement is made regardless of amount, § 432(c);

25
• preserving receipts for all disbursements over $200 and all records for three years, §§ 432(c) and (d);

26
• filing a statement of organization containing (1) its name and address; (2) the name of its custodian of records; and (3) its banks, safety deposit boxes, or other depositories, §§ 433(a) and (b);

27
• reporting any change in the above information within 10 days, § 433(c);

28
• terminating only upon filing a written statement that it will no longer receive any contributions or make any disbursements, and that it has no outstanding debts or obligations, § 433(d)(1);

29
• filing either (1) monthly reports with the FEC; or (2) quarterly reports during election years, a pre-election report no later than the 12th day before an election, a post-election report within 30 days after an election, and reports every 6 months during nonelection years, §§ 434(a)(4)(A) and (B);

30
• including in such reports information regarding (1) the amount of cash on hand; (2) the total amount of receipts in multiple categories; (3) the identification of each political committee and candidate's authorized or affiliated committee making contributions, and any persons making loans, providing rebates, refunds, dividends, interest, or any other offset to operating expenditures in an aggregate amount above $200; (4) the total amount of all disbursements in numerous categories; (5) the names of all authorized or affiliated committees to which transfers have been made; (6) persons to whom loan repayments or refunds have been made; and (7) the total sum of all contributions, operating expenses, outstanding debts and obligations, and the settlement terms of the retirement of any debt or obligation, § 434(b); and

31
• soliciting contributions for its separate segregated fund only from its "members," §§ 441b(b)(4)(A) and (C), which, under FEC v. National Right to Work Committee, 459 U.S. 197, 203-206, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("NRWC"), does not include persons who have merely contributed to or expressed support for the group in the past.

32
Many small groups may be unable to bear the substantial costs of complying with these regulations. These "more extensive requirements and more stringent restrictions... may create a disincentive for such organizations to engage in political speech." MCFL, 479 U.S. at 254, 107 S.Ct. 616. This is because:

33
Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports, and to monitor garage sales lest nonmembers take a fancy to the merchandise on display, it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it.

34
Id. at 255, 107 S.Ct. 616. And Justice O'Connor emphasized in her concurring opinion that "the additional organizational restraints" imposed on "groups such as MCFL" by the Act amount to a "significant burden" on their First Amendment interests. 479 U.S. at 266, 107 S.Ct. 616 (O'Connor, J., concurring in part and concurring in the judgment).

35
Thus, what was true of MCFL is equally true of NCRL:

36
[W]hile § 441b does not remove all opportunities for independent spending by organizations such as MCFL, the avenue it leaves open is more burdensome than the one it forecloses. The fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize § 441b as an infringement on First Amendment activities.

37
MCFL, 479 U.S. at 255, 107 S.Ct. 616. The "practical effect" of § 441b(a) on NCRL "is to make engaging in protected speech a severely demanding task." MCFL, 479 U.S. at 256, 107 S.Ct. 616. Accordingly, we have little difficulty concluding that the prohibitions of § 441b(a) and 11 C.F.R. §§ 114.2(b) and 114.10 burden the exercise of political speech and association.

C.
1.

38
Having determined that 2 U.S.C. § 441b(a) and the associated regulations burden a significant First Amendment interest in the exercise of political speech and association, we must first determine whether the prohibition on expenditures is narrowly tailored to serve a compelling governmental interest. Buckley, 424 U.S. at 44-45, 96 S.Ct. 612. Then we must determine whether the proscription on contributions is closely drawn to match a sufficiently important governmental interest. Shrink Missouri, 528 U.S. at 387-88, 120 S.Ct. 897. "The Supreme Court has regularly recognized that the prevention of real and perceived corruption in the electoral process qualifies as a compelling state interest." Adventure Communications, Inc. v. Ky. Registry of Election Fin., 191 F.3d 429, 442 (4th Cir.1999); see also FEC v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 496-97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("NCPAC"); Shrink Missouri, 528 U.S. at 388-89, 120 S.Ct. 897. The danger of corruption or the appearance of corruption is especially keen in the context of corporate contributions and expenditures because of the unique legal and economic characteristics of the corporate form. Corporations benefit from state laws that grant them special advantages such as limited liability, favorable treatment for asset accumulation, and perpetual life. These state-created advantages allow corporations to attract capital and deploy resources in order to maximize shareholder wealth in ways that other business forms cannot. Corporations could use that wealth to influence federal elections. See, e.g., Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 658-59, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). Consequently, the Court has identified certain types of corruption that may warrant legislative regulation of a corporation's ability to make expenditures or contributions in connection with federal elections.

39
The first and most obvious type of corruption identified by the Court is quid pro quo corruption, where an officeholder takes money with the explicit understanding that he will perform certain duties for the donor in return. See generally Thomas Burke, The Concept of Corruption in Campaign Finance Law, 14 Const. Comment. 127, 131-33 (1997). As the Court noted in Buckley, "To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." 424 U.S. at 26, 96 S.Ct. 612. Simply put, "[t]he hallmark of corruption is the financial quid pro quo: dollars for political favors." NCPAC, 470 U.S. at 497, 105 S.Ct. 1459.

40
Quid pro quo corruption is related to a second form of corruption, monetary influence. Corruption through monetary influence is a more subtle and hence more pervasive form of corruption than the quid pro quo, one in which officeholders consider monetary influences when performing their public duties. Monetary influence need not involve an explicit deal between a donor and an officeholder. Burke, supra, at 131-33. The corrupting effect of monetary influences has been clarified in the case law as the concern over the power of corporations to utilize the special advantages of the corporate form to create political "war chests" which could be used to incur political debts. NRWC, 459 U.S. at 207-08, 103 S.Ct. 552. The concern here has to do with permitting corporations to use "resources amassed in the economic marketplace" to obtain "an unfair advantage in the political marketplace." MCFL, 479 U.S. at 257, 107 S.Ct. 616. Accordingly, the Court has recognized as compelling the governmental interest in preventing corruption, which supports restricting the influence of political "war chests" funneled through the corporate form. NRWC, 459 U.S. at 207-08, 103 S.Ct. 552; see also MCFL, 479 U.S. at 257, 107 S.Ct. 616.

41
Third, the possibility of distortion of political support for corporate causes has been recognized as a form of corruption significant enough to warrant government regulation. Burke, supra, at 133-135. Distortion involves the concern that "[t]he resources in the treasury of a business corporation ... are not an indication of popular support for the corporation's political ideas." MCFL, 479 U.S. at 258, 107 S.Ct. 616. Instead, these resources may reflect only "the economically motivated decisions of investors and customers." Id. The fear here is that shareholders or members of certain corporations will have an "economic disincentive for disassociating with [the corporation] if they disagree with its political activity." Id. at 264, 107 S.Ct. 616; see also Austin, 494 U.S. at 663, 110 S.Ct. 1391. Accordingly, the potential for distortion is also a compelling governmental interest for limiting political expression. MCFL, 479 U.S. at 263-64, 107 S.Ct. 616; Austin, 494 U.S. at 663, 110 S.Ct. 1391.

2.

42
Nevertheless, the Supreme Court has also made it clear that the "[r]egulation of corporate political activity ... has reflected concern not about use of the corporate form per se, but about the potential for unfair deployment of wealth for political purposes." MCFL, 479 U.S. at 259, 107 S.Ct. 616. This potential presents a real danger when for-profit corporations are involved. However, such a danger is not present when the corporation at issue is a nonprofit advocacy corporation.

43
To begin with, when independent expenditures are considered, the potential for corruption, whether it be quid pro quo, monetary influence, or distortion, is "substantially diminished." Buckley, 424 U.S. at 47, 96 S.Ct. 612. Hence, the Supreme Court has crafted an exception to the expenditure prohibition contained in 2 U.S.C. § 441b(a) for nonprofit advocacy corporations. This is the so-called MCFL exception. This court has already held that NCRL is entitled to the MCFL exception. NCRL I, 168 F.3d at 714.

44
In NCRL I, we determined that "the list of nonprofit corporate characteristics in MCFL was not `a constitutional test for when a nonprofit must be exempt,' but `an application, in three parts, of First Amendment jurisprudence to the facts in MCFL.'" 168 F.3d at 714 (quoting Day v. Holahan, 34 F.3d 1356, 1363 (8th Cir. 1994)). After examining the factors identified in MCFL, we were persuaded that NCRL was entitled to the MCFL exception. Id. When applying MCFL, we noted that "NCRL displays all the typical characteristics of the non-profit form — it does not engage in profit-making activity, it has no shareholders or other persons who might have [a claim] on its assets and earnings, and it is exempt from federal income taxation." Id. Unlike MCFL, NCRL did not have a policy against accepting corporate donations. However, NCRL was funded overwhelmingly by private, individual donations. While NCRL had accepted some corporate donations in the past, these donations made up only between zero and eight percent of NCRL's total revenues. Id. We concluded that "this modest percentage of revenue" did not disqualify NCRL for the MCFL exemption. Id. In addition, many of those corporate contributions were not of the traditional form because they were "part of a program by which phone company customers may direct their phone bill refunds to a nonprofit of their choice." Id. Therefore, we held that "NCRL falls squarely within the MCFL exception." Id.

45
Because NCRL has not changed in any relevant way since our decision in NCRL I, NCRL does not "serv[e] as [a] conduit[] for the type of direct spending that creates a threat to the political marketplace." MCFL, 479 U.S. at 264, 107 S.Ct. 616. This constitutionally entitles NCRL to an exemption from the provisions banning independent expenditures in § 441b(a) and 11 C.F.R. § 114.2(b). And because the exception in 11 C.F.R. § 114.10 constitutes merely a rigid codification of the factors in MCFL, it is also unconstitutional as applied to NCRL.

3.

46
While the FEC recognizes that our decision in NCRL I controls the outcome of this case insofar as independent expenditures are concerned, it contends that we must consider contributions separately and hold the contribution portion of the statute and regulations constitutional as applied to NCRL. The Supreme Court has not addressed whether the risk of corruption from direct contributions is present when the contributors are nonprofit advocacy corporations who neither have shareholders nor investing members, and accept the overwhelming share of their donations from private individuals. We do not believe that it is.

47
Viewing every direct campaign contribution from a nonprofit advocacy corporation to be corrupting would be devastating to the proper functioning of the political process. The argument that only an absolute ban on nonprofit contributions can serve the important public interest in preventing corruption simply proves too much. If this were true, contributions would also have to be banned in every situation where contributing individuals or unincorporated associations bore a strong commitment to an issue or candidate. Instead, limits, not total bans, have been adopted for individuals and unincorporated advocacy groups.

48
NCRL is more akin to an individual or an unincorporated advocacy group than a for-profit corporation. Neither individuals nor unincorporated advocacy groups pose so great a risk of quid pro quo or monetary influence corruption that a ban on contributions is required. Similarly, nonprofit advocacy corporations do not avail themselves of the state-conferred advantages associated with the corporate form, which is the rationale for regulating corporate activity in the first place. See, e.g., Austin, 494 U.S. at 658-59, 110 S.Ct. 1391. Advocacy groups rely on donations to fund a variety of projects, none of which involve making a profit in the capital markets. It is simply implausible to argue that a small nonprofit accepting individual contributions from like-minded donors poses the same risk to our political order as a Fortune 500 company.

49
However, the FEC argues that by virtue of taking the corporate form, NCRL now poses those risks. But MCFL requires a different conclusion. The Court emphasized that taking the corporate form does not, by itself, transform an otherwise benign group into one that poses an inherent risk of corruption. As noted earlier, NCRL, like MCFL, "was formed to disseminate political ideas, not to amass capital." MCFL, 479 U.S. at 259, 107 S.Ct. 616. Thus, NCRL does not utilize the advantages states confer on corporations that enable them to amass capital. The advantages NCRL derives from taking on the corporate form are those "that redound to its benefit as a political organization, not as a profit-making enterprise." Id.

50
NCRL also poses no threat of distortion of political support because the very reason people join and contribute to NCRL is that their views are aligned with those of the organization. NCRL's members have no underlying economic incentive to join the group, making NCRL distinctly different from for-profit corporations and many non-profits as well. See, e.g., Austin, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652. There is simply no danger that a nonprofit advocacy group's cause will bear no relation to the beliefs of its contributors and members because the group's raison d'etre is to amplify and publicize those beliefs. Nor is there the danger that an individual donor would feel alienated because his views are diametrically opposed to those of the organization. In fact, as the Court recognized in MCFL, individuals contribute to political organizations "precisely because they support those purposes," and because they believe that contribution is a "more effective means of advocacy" than spending the money on their own. 479 U.S. at 260-61, 107 S.Ct. 616. Thus, allowing NCRL to make limited contributions creates no credible threat of distortion to the political process.

51
To be sure, it would be administratively more convenient if all direct contributions to candidates were prohibited. After all, a bright-line rule would be easier to administer and would tend to avoid litigation. It could likewise be said, of course, that convenience would be served if all corporate independent expenditures were prohibited. But the Court in MCFL flatly refused to credit administrative convenience as an adequate basis for such a blanket rule, stating that "the desire for a bright-line rule ... hardly constitutes the compelling state interest necessary to justify any infringement on First Amendment freedom." 479 U.S. at 263, 107 S.Ct. 616. Although administrative convenience constitutes a legitimate state interest where rational basis scrutiny of regulatory enactments is involved, such convenience is insufficient to justify state action that triggers any level of heightened scrutiny. See, e.g., Craig v. Boren, 429 U.S. 190, 198, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (citing decisions that "rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications"). And while the Court has differentiated the level of scrutiny applied to expenditure restrictions and contribution restrictions, see Shrink Missouri, 528 U.S. at 386-88, 120 S.Ct. 897, we do not understand it to have relegated the latter to a mere matter of rational basis review. The Court has recently stated that "a contribution limit involving `significant interference' with associational rights ... [can] survive if the Government demonstrate[s] that contribution regulation [is] `closely drawn' to match a `sufficiently important interest.'" Shrink Missouri, 528 U.S. at 387-88, 120 S.Ct. 897 (quoting Buckley, 424 U.S. at 25, 96 S.Ct. 612). This formulation requires something more exacting than rational basis review. As a result, a rationale of administrative convenience cannot successfully be advanced to sustain § 441b(a) and the FEC's sweeping regulatory ban at issue in this case.

52
Organizations that in substance pose no risk of "unfair deployment of wealth for political purposes" may not be banned from participating in political activity simply because they have taken on the corporate form. MCFL, 479 U.S. at 259, 107 S.Ct. 616. The rationale utilized by the Court in MCFL to declare prohibitions on independent expenditures unconstitutional as applied to MCFL-type corporations is equally applicable in the context of direct contributions. In neither case is there the threat of quid pro quo, monetary influence, or distortion corruption that the prohibitions seek to prevent. We cannot sustain a measure that drains lifeforce from democracy when that measure does not reflect the public interest that would warrant such a drastic step. A corporation that qualifies for an MCFL exception poses no special threat to the political process. See MCFL, 479 U.S. at 263, 107 S.Ct. 616 ("It is not the case ... that MCFL merely poses less of a threat of the danger that has prompted regulation. Rather, it does not pose such a threat at all."). As a consequence, neither NCRL's expenditures nor its contributions may be prohibited under the First Amendment.

4.

53
In making this determination, we seek only to respect the Supreme Court's basic pronouncement in MCFL on the role that nonprofit advocacy groups play in our political life. We do not think that other decisions undermine the Supreme Court's commitment to the expressive and associational values that these organizations promote. In Austin, the Supreme Court held that a state statute banning direct contributions could be applied to the Michigan State Chamber of Commerce, a nonprofit corporation. 494 U.S. at 654-55, 110 S.Ct. 1391. Although Austin did uphold a state ban on contributions as applied to the Chamber, the Court noted that the Chamber was established for many varied purposes and was not inherently a political advocacy group like MCFL. Id. at 661-65, 110 S.Ct. 1391. In fact, the Chamber's educational goals were "not expressly tied to political goals," and many of the Chamber's members, much like shareholders in a for-profit corporation, might be reluctant to withdraw their membership if they did not agree with the Chamber's political expression. Id. at 662-63, 110 S.Ct. 1391. The Austin Court also noted that the Chamber had for-profit members and did not exhibit the characteristics identified in MCFL that would require the state to grant an exemption. In contrast, we have earlier held that NCRL exhibits the precise characteristics identified in MCFL and is entitled to the MCFL exception. NCRL I, 168 F.3d at 714.

54
Similarly, we are not persuaded that the Court's decision in NRWC requires the sweeping holding that an absolute ban on nonprofit contributions is constitutional. In NRWC, the Court had to determine whether National Right to Work Committee ("NRWC"), a nonprofit corporation, had violated 2 U.S.C. § 441b(b)(4)(C) by using its general funds to solicit contributions for its separate segregated political fund from persons who were not its "members." 459 U.S. at 198-99, 103 S.Ct. 552. The issues in NRWC were whether NRWC's mailing had been sent to persons who did not fall within the statutory definition of "member," and, if so, whether the restriction on soliciting only "members" was constitutional. Id. at 198, 200-01, 206-11, 103 S.Ct. 552. The NRWC Court did not decide the constitutionality of the corporate ban provision as applied to MCFL-type corporations. However, that is precisely the question that confronts us today.

55
The District of Columbia Circuit took the approach that we now adopt in determining whether the FEC could successfully bring a civil enforcement action against the National Rifle Association ("NRA") for allegedly impermissible contributions and expenditures made during different years. FEC v. National Rifle Ass'n., 254 F.3d 173 (D.C.Cir.2001). That court expressed the view that corporate ban provisions are valid only insofar as they prevent certain threats to the political process. Id. at 191-92. It held that corporations which do not pose such threats may not be subject to § 441b(a)'s restrictions regardless of whether the restriction is on expenditures or contributions. The D.C. Circuit noted, "As we read MCFL and Austin, the [FEC] must demonstrate that the NRA's political activities threaten to distort the electoral process through the use of resources that, as MCFL put it, reflect the organization's `success in the economic marketplace' rather than the `power of its ideas.'" Id. at 191 (quoting MCFL, 479 U.S. at 258-59, 107 S.Ct. 616). Since the FEC could not meet this burden with respect to one of the years at issue, § 441b(a) could not constitutionally be applied to the NRA's contributions and expenditures during that year. Id. at 192-93.

5.

56
Finally, the FEC has failed to meet its other burden in this case. In addition to showing that a sufficiently important governmental interest justifies the prohibition on contributions in the statute and regulations, the FEC was required to prove that the provisions are closely drawn to match it. Shrink Missouri, 528 U.S. at 387-88, 120 S.Ct. 897. In Buckley, the Court held that a $1,000 limit on contributions to candidates for federal elective office by an individual or a group was constitutional because "the Act's contribution limitations in themselves do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues." 424 U.S. at 28-29, 96 S.Ct. 612. Yet, when a limit becomes a ban, the burden of demonstrating that the regulation is closely drawn becomes that much more difficult. This is especially the case when that ban, combined with the costs and burdens associated with forming a separate segregated fund, could effectively cripple small, nonprofit advocacy groups that may have few or no ties to the world inhabited by for-profit corporations.

57
As noted earlier, it is possible to respect the congressional interest in minimizing corruption and to simultaneously doubt that an all-out ban on contributions by nonprofit advocacy corporations is necessary to prevent this potential abuse. The government has not met its burden of showing that § 441b(a) is closely drawn as applied to nonprofit advocacy corporations when other means, such as contribution limits, are fully available to address the important public interest in honest elections.

58
It is, of course, the task of Congress, not the courts, to set limits on campaign contributions. Such contribution limits for individuals, corporations, and political committees have withstood numerous constitutional challenges. See Buckley, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659; California Med. Ass'n v. FEC, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (allowing limits on contributions to political committees). Such contribution limits reduce the risk that either individuals or for-profit corporations can circumvent FECA and § 441b(a) by establishing and utilizing nonprofit advocacy groups to funnel money that could not otherwise be placed into the pockets of political candidates. The utilization of an absolute ban on advocacy group contributions becomes especially suspect when more closely drawn and widely utilized means, such as contribution limits, exist to address the asserted problem.

59
In sum, the issue is whether political associations that are incorporated, but present no risk whatever to the political process, see MCFL, 479 U.S. at 263, 107 S.Ct. 616, may be altogether prohibited from making contributions or expenditures out of their general treasuries simply by virtue of their corporate status. The district court correctly found "the distinction between contributions and expenditures to be immaterial in this case." Beaumont v. FEC, 137 F.Supp.2d 648, 657 (E.D.N.C. 2000). The issue is whether the FEC has demonstrated a sufficient interest "in prohibiting even limited contributions by all corporations, even those that `do[] not pose such a threat.'" Id. (quoting MCFL, 479 U.S. at 263, 107 S.Ct. 616). Because we find that the FEC has not met this burden, we hold that the absolute ban on contributions and expenditures in § 441b(a) and its implementing regulations cannot constitutionally be applied to NCRL. If we held otherwise, we believe we would be effectively eviscerating the political role of nonprofit advocacy groups highlighted by the Supreme Court in MCFL.

III.

60
The plaintiffs ask us to go beyond the district court's decision that § 441b(a) and its implementing regulations are unconstitutional as applied to NCRL, and hold these provisions facially unconstitutional. This step would fly in the face of Supreme Court precedent, and we decline to take it.

61
A ruling of facial invalidity based on overbreadth "is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). See also Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 484-85, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); Colorado I, 518 U.S. at 623-24, 116 S.Ct. 2309. Thus, rulings of facial invalidity are distinctly disfavored as a brusque intrusion on the legislative branch and a real breach of the separation of powers. A court properly holds a statute facially invalid only where "the over-breadth [is] substantial ..., judged in relation to the statute's plainly legitimate sweep." Broadrick, 413 U.S. at 615, 93 S.Ct. 2908.

62
Applying this test, we agree with the district court's conclusion that § 441b(a) is not facially overbroad. Despite the list of nonprofit, tax-exempt corporations that the plaintiffs compiled in support of its over-breadth claim, the district court properly found that they had failed as an empirical matter "to demonstrate that the constitutional infringements caused by [§ 441b(a)] and the related regulations are `substantial' in relation to their `plainly legitimate sweep.'" First, the plaintiffs fail to distinguish between those nonprofit corporations that are exempt and those that are not. And the Court held in Austin that an almost identical state statute may be properly applied to some nonprofit corporations. See 494 U.S. at 661-65, 110 S.Ct. 1391.

63
Second, even if we were to assume that every one of the corporations on the plaintiffs' list are entitled to an exemption, no calculations are necessary to conclude that hundreds or even thousands of constitutionally protected advocacy groups pale in comparison to the infinitely larger number of for-profit corporations that exist in this country. And the plaintiffs do not suggest that § 441b(a) and the regulations are unconstitutional with respect to for-profit corporations, not to mention the many labor organizations and national banks to which the provisions also apply. Indeed, the Supreme Court and other courts have upheld § 441b(a)'s validity in routine applications. See, e.g., NRWC, 459 U.S. at 207-211, 103 S.Ct. 552; Nat'l Rifle Ass'n, 254 F.3d at 191-92 (upholding application of § 441b(a) for certain years); Mariani v. United States, 212 F.3d 761, 773 (3d Cir. 2000) (en banc), cert. denied, 531 U.S. 1010, 121 S.Ct. 564, 148 L.Ed.2d 484 (2000). In short, the plaintiffs cannot establish substantial overbreadth in this case.

64
A further fatal flaw in the plaintiffs' overbreadth position is that the Supreme Court has rejected it. In Austin, the Court held that a state statute, modeled on § 441b(a) and almost identical to it, was "not substantially overbroad." 494 U.S. at 661, 110 S.Ct. 1391. The Court then went on to apply the MCFL exception, which was not contained in the statute, to determine whether the statute was constitutional as applied. Id. at 661-65, 110 S.Ct. 1391. Thus, the plaintiffs' argument that § 441b(a) is facially invalid because its text does not contain an MCFL exception fails in view of the Court's own refusal in Austin to declare an almost identical state statute facially invalid for the same reason. The Supreme Court has consistently endorsed as-applied rulings in reviewing the constitutionality of FECA and analogous state statutes. See Colorado II, 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461; Colorado I, 518 U.S. at 613-14, 623-26, 116 S.Ct. 2309; Austin, 494 U.S. at 661-65, 110 S.Ct. 1391; MCFL, 479 U.S. at 263-64, 107 S.Ct. 616; Buckley, 424 U.S. at 68-74, 96 S.Ct. 612. Indeed, MCFL explicitly anticipated the possibility that only a "small" group of corporations would be exempt from § 441b(a)'s prohibitions on independent expenditures. 479 U.S. at 264, 107 S.Ct. 616.

65
Finally, Congress included a severability clause in FECA that provides for retaining as much of the statute as possible where it is found invalid in particular applications. Specifically, the clause states that "[i]f any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the validity of the remainder of the Act and the application of such provision to other persons and circumstances shall not be affected thereby." 2 U.S.C. § 454. Congress has made its intent clear. And after applying conventional overbreadth doctrine in this case, we see no reason to frustrate it.

66
For all of these reasons, we hold that § 441b(a) and the associated regulations are not facially overbroad. Whatever overbreadth exists "should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." Broadrick, 413 U.S. at 615-16, 93 S.Ct. 2908. If every partial constitutional shortcoming in a statute mandated its wholesale demise, the courts would assume for themselves more fearsome powers than our Constitution posits.

IV.

67
This court would not lightly conclude that any federal statute was unconstitutional in any of its applications. We also view seriously the interest in keeping American elections rigorously honest, as well as expressively robust. However, it is important to consider in perspective the sweeping nature of the position that the FEC is urging us to take. The Commission asks us to hold that an absolute ban on every direct contribution by every non-profit advocacy corporation in America is altogether legitimate. No matter how small the organization, no matter how modest the contribution, and no matter how absent the threat the group poses to the political process, the FEC argues that the contribution can be prohibited.

68
This position overlooks the difference between for-profit corporations and non-profit advocacy groups funded overwhelmingly by individual donors who simply happen to believe in their ideas. An advocacy group, the Supreme Court has noted, does not "merely pose[] less of a threat of the danger that has prompted regulation. Rather, it does not pose such a threat at all." MCFL, 479 U.S. at 263, 107 S.Ct. 616. Yet the FEC would require that the full panoply of regulatory requirements be imposed upon nonprofit corporations before they can begin to participate in the political process in what the Supreme Court has emphasized is a meaningful and important way. See 2 U.S.C. §§ 432, 433, 434, and 441b(b)(4)(A) and (C). Viewed in this light, the step we take is a cautious and modest one. It is only the consequences of failing to take it that would loom immeasurably large for the vitality of the democratic system of government that the First Amendment is intended to protect.

69
In its order of judgment of January 24, 2001, the district court declared that 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2(b) and 114.10 were unconstitutional as applied to NCRL, a non-profit, MCFL-type corporation. The court therefore permanently enjoined the FEC from prosecuting the plaintiffs for violations of § 441b and 11 C.F.R. §§ 114.2(b) and 114.10. For the foregoing reasons, its judgment is

70

AFFIRMED.

Notes:

1
First, MCFL was created to promote political ideas, and could not engage in business activities. Second, it had no shareholders or other persons with a claim on its assets or earnings. And third, it was not established by a business corporation or labor union, and had a policy of refusing contributions from such entitiesMCFL, 479 U.S. at 263-64, 107 S.Ct. 616.

2
What the Court said of the nonprofit corporation at issue inMCFL applies with equal force to NCRL. Applying MCFL in North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705 (4th Cir. 1999) ("NCRL I"), we found that the small amount of corporate contributions NCRL received did not result in its "serving as a conduit `for the type of direct spending [by for-profit corporations] that creates a threat to the political marketplace.' MCFL, 479 U.S. at 264, 107 S.Ct. 616." NCRL I, 168 F.3d at 714. We therefore held that "NCRL falls squarely within the MCFL exception." Id.

3
The FEC argues that NCRL lacks standing to challenge 11 C.F.R. § 114.10, relying on our holding inNCRL I that "NCRL falls squarely within the MCFL exception." 168 F.3d at 714. The Commission correctly observes that NCRL I entitles NCRL to make independent expenditures in connection with federal elections regardless of the FEC's regulation or intentions. See supra note 2. Thus, the Commission submits that the mere existence of a regulation that it cannot enforce against NCRL cannot cause NCRL any injury.
We are not persuaded. The FEC has made inconsistent statements throughout this litigation, and its present position is not sufficient to dispel the "credible threat of prosecution" under which NCRL operates. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); Va. Soc'y for Human Life, Inc. v. FEC, 263 F.3d 379, 386 (4th Cir.2001). Though the Commission agrees that it is bound by NCRL I, it has not foresworn its ultimate intention to prohibit NCRL even from making independent expenditures. On the contrary, the FEC argued below that if in the future NCRL were to receive a more substantial portion of its funding from for-profit corporations, it would not qualify for the MCFL exception even under the holding in NCRL I. Because we cannot conclude that NCRL does not presently operate under the potential threat of an enforcement action, we agree with the district court that NCRL has standing to challenge 11 C.F.R. § 114.10.

4
In her concurring opinion, Justice O'Connor pointedly emphasized that "the significant burden on MCFL in this case comes ... from the additional organizational restraints imposed upon it by the Act," as well as from the Act's "solicitation restrictions." 479 U.S. at 266, 107 S.Ct. 616 (O'Connor, J., concurring in part and concurring in the judgment). Therefore, a majority of the Court inMCFL rejected the argument that the FEC is presently urging upon us.

71
WIDENER, Circuit Judge, concurring and dissenting.

72
I concur in the result of affirmance and in all of the opinion of Judge Wilkinson, with the exception of Part III.

73
As to part III, I am of opinion we should decline to consider the broader question of whether 2 U.S.C. § 441b(a) and its implementing regulations are facially unconstitutional, that being unnecessary to an affirmance. I would follow Rule 2 of Ashwander: "The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it.... It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." Ashwander v. TVA, 297 U.S. 288, 341, 346-347, 56 S.Ct. 466, 80 L.Ed. 688 (1935) (Justice Brandeis concurring, internal quotations and citations omitted).

74
GREGORY, Circuit Judge, concurring in part and dissenting in part.

75
I concur in Parts II.C.1 and II.C.2 of the court's opinion. I agree that, insofar as independent expenditures are concerned, this case is controlled by North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 713 (4th Cir.1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000). I also concur in Part III of the Court's opinion; § 441b(a) is not substantially overbroad. I respectfully dissent, however, from Parts II.C.3 through II.C.5. That portion of the opinion, which holds that NCRL must be given an MCFL-type exemption for its campaign contributions, is inconsistent with FEC v. National Right to Work Committee, 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("NRWC"). I would join the Sixth Circuit in upholding § 441b(a)'s ban on contributions by non-profit ideological corporations such as NCRL. Kentucky Right To Life, Inc. v. Terry, 108 F.3d 637 (6th Cir.1997).

76
I see no way to avoid the import of the Supreme Court's analysis in NRWC. See also FEC v. Nat'l Conservative PAC, 470 U.S. 480, 495, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (noting that NRWC upheld "the prohibition of corporate campaign contributions"). The majority relies almost exclusively on FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("MCFL"), to reach its result. In doing so, however, the majority turns a blind eye not only to NRWC, but to the extended discussion of NRWC contained in both the MCFL majority and dissenting opinions. This subsequent endorsement of the holding of NRWC, adhered to by every Member of the Court, confirms the validity of § 441b(a)'s ban on corporate contributions, even as applied to non-profit corporations such as NCRL.

77
In NRWC, the Supreme Court addressed § 441b's regulation of corporate campaign contributions as applied to non-profit corporations. Specifically, the Court considered the scope of the exemption contained in § 441b(b)(2)(C) and §§ 441b(b)(4)(A) and (C) to § 441b(a)'s ban on corporate contributions and expenditures. 459 U.S. at 207-11, 103 S.Ct. 552. Section 441b(b)(2)(C) exempts "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation...." Sections 441b(b)(4)(A) and (C) further define the scope of the exemption by limiting "solicitation of contributions" by corporations without capital stock to its "members." The issue in NRWC was whether the corporation had "limited its solicitation of funds to `members'," but that specific question was "but the tip of the statutory iceberg" because the solicitation of funds was part of an exemption from the general rule prohibiting corporate contributions. Id. at 198, n. 1, 103 S.Ct. 552.

78
The Court found two purposes sufficient to justify § 441b's "prohibitions and exceptions." The first purpose was "to ensure that substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political `war chests' which could be used to incur political debts from legislators who are aided by the contributors." Id. at 207, 103 S.Ct. 588. The second purpose was "to protect the individuals who have paid money into a corporation ... for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed." Id. at 208, 103 S.Ct. 588.

79
NRWC was a non-profit corporation similar to MCFL and NRCL, funded by solicitations that "would neither corrupt officials nor coerce members of the corporation holding minority political views...." 459 U.S. at 207, 103 S.Ct. 552. The definition NRWC sought for the term "members" would only include persons who were "philosophically compatible" with the corporation. Id. at 206, 210, 103 S.Ct. 552; see also MCFL, 479 U.S. at 269, 107 S.Ct. 616 (Rehnquist, C.J., dissenting). But the Court "declined the invitation to modify the statute to account for the characteristics of different corporations," MCFL, 479 U.S. at 269, 107 S.Ct. 616, finding that § 441b was "sufficiently tailored" to "avoid undue restriction" on NRWC's First Amendment rights:

80
In order to prevent both actual and apparent corruption, Congress aimed a part of its regulatory scheme at corporations. The statute reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation. While § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress's judgment that it is the potential for such influence that demands regulation. Nor will we second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared. As we said in California Medical Association v. FEC, 453 U.S. 182, 201, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981), the "differing structures and purposes" of different entities "may require different forms of regulation in order to protect the integrity of the electoral process."

81
NRWC, 459 U.S. at 209, 103 S.Ct. 552 (citations omitted). Repeating the acknowledged interests in preventing corruption and the appearance of corruption, the Court concluded that "there is no reason why it may not in this case be accomplished by treating unions, corporations, and similar organizations differently from individuals." Id. at 208, 210, 103 S.Ct. 552; Buckley v. Valeo, 424 U.S. 1, 26-27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 788, n. 26, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

82
I understand the majority's point that NRWC dealt with the definition of "members" for § 441b segregated fund solicitations purposes, but the NRWC Court's discussion of the exception cannot be so easily divorced from its discussion of the general rule. In considering the scope of the exception to § 441b's prohibition, the Court also considered the prohibition itself. Indeed, the Court's analysis of the exception was largely determined by the need to give broad prophylactic effect to the ban on corporate contributions.

83
The majority rejects NRWC in favor of MCFL, arguing that the Constitution ought to view § 441b's ban on contributions the same as it views the ban on expenditures. The respective discussions in both the majority and dissenting opinions in MCFL demonstrate that the Supreme Court struggled with this very question. Chief Justice Rehnquist, writing in dissent in MCFL, and joined by three other Justices, took the view that there was no constitutional difference between contributions and independent expenditures in the context of § 441b. 479 U.S. at 270, 107 S.Ct. 616. According to the Chief Justice's view, NRWC required a finding of constitutionality in MCFL. See MCFL, 479 U.S. at 269, 107 S.Ct. 616 ("I would have thought the distinctions drawn by the Court today largely foreclosed by our decision in NRWC."). Justice Brennan, writing for a majority of the Court, thought otherwise, specifically distinguishing NRWC by noting that NRWC involved direct contributions to candidates:

84
[T]he political activity at issue in that case was contributions .... (citations omitted.) We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending. (citations omitted.) In light of the historical role of contributions in the corruption of the electoral process, the need for a broad prophylactic rule was thus sufficient in National Right to Work Committee to support a limitation on the ability of a committee to raise money for direct contributions to candidates. The limitation on solicitation in this case, however, means that nonmember corporations can hardly raise any funds at all to engage in political speech warranting the highest constitutional protection. Regulation that would produce such a result demands far more precision than § 441b provides. Therefore, the desirability of a broad prophylactic rule cannot justify treating alike business corporations and [MCFL] in the regulation of independent spending.

85
MCFL, 479 U.S. at 260, 107 S.Ct. 616 (emphasis added).

86
If MCFL had not mentioned NRWC, I might question its continuing vitality. The amount of deference shown to legislative judgment certainly differs between NRWC and MCFL. Compare NRWC, 459 U.S. at 210, 103 S.Ct. 552 ("[W]e accept Congress's judgment that it is the potential for such influence that demands regulation."), with MCFL, 479 U.S. at 260, 107 S.Ct. 616 ("Regulation that would produce such a result demands far more precision than § 441b provides."). Or if the Court in MCFL had distinguished NRWC in the way the majority does here, instead of going out of its way to confirm NRWC as applied to corporate contributions, I might be persuaded by the majority in this case. But the Court took neither of those two options, instead expressly reaffirming NRWC, and explaining it as a contributions case. After considering this caselaw, I cannot escape the conclusion that NRWC is dispositive with respect to § 441b's ban on corporate contributions. I respectfully dissent.